## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| FORD MOTOR COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. _____ |
| v. | ) | |
| | ) | |
| KAWASAKI KISEN KAISHA LTD. | ) | |
| AND "K" LINE AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>COMPLAINT</u>

### Nature of the Case

Plaintiff Ford Motor Company ("FMC"), on its own behalf and on behalf of assignee Ford Lio Ho Motor Company, Ltd. ("FLH") (collectively, "Ford"), by its attorneys, brings this breach of contract, bailment, tort, and admiralty action against Defendants Kawasaki Kisen Kaisha Ltd. ("K-Line") and "K" Line America, Inc. ("KAM") (collectively, the "K-Line Group"). FMC and the K-Line Group entered into a Transportation Services Main Agreement ("TSA") for the ocean transportation of automobiles aboard roll-on roll-off car carrier ships. Ford seeks to recover amounts owed for 246 Ford Rangers ("Ford Rangers") destroyed in a marine fire aboard an ocean-going car carrier ship chartered, managed, staffed, operated, maintained, and documented by the K-Line Group. FLH was the consignee of the Ford Rangers.

### Parties

1.      FMC is a Delaware corporation with its principal place of business at One American Road, Dearborn, Michigan. FMC is a party to the TSA, and at all relevant times, was and is still doing business within the jurisdiction of this Court.

2.      FLH has its principal place of business in Taiwan.  FLH was the consignee of the Ford Rangers at the time of the fire loss.  As a consignee of the Ford Rangers, FLH is an intended third-party beneficiary of the TSA.  FLH has explicitly assigned all of its claims, including its intended third-party beneficiary claims for the loss of the Ford Rangers, to FMC and provided notice of the assignment to the K-Line Group.

3.      K-Line is a Japanese company.  K-Line is the ultimate parent of a group of companies, including KAM and K-Line RoRo Bulk Ship Management Co. ("K-Line Management").

4.      KAM is a wholly-owned United States subsidiary of K-Line, and is incorporated and qualified as a for-profit corporation in the State of Michigan.  KAM is designated as the North American General Agent for K-Line.  KAM supports K-Line's business operations in the ocean car carrier shipping sector in America.  KAM executed the TSA on K-Line's behalf on or about March 19, 2019.  The TSA identifies KAM as the party to be served with any notice of claims or breach.

**Jurisdiction and Venue**

5.     This Court has subject-matter jurisdiction over any civil case of admiralty or maritime jurisdiction pursuant to 28 U.S.C. § 1333.

6.     FMC is a Delaware corporation with its principal place of business in Dearborn, Michigan.

7.     K-Line is a Japanese company with its principal place of business in Tokyo, Japan.

8.     KAM is a Michigan corporation, with its principal place of business in Glen Allen, Virginia.

9.     The principal objective of the TSA is maritime commerce by the transportation of goods by sea aboard an ocean-going vessel, including shipment of the Ford Rangers aboard the *Diamond Highway* ("Ship").

10.     At the time of the Ship fire, the Ford Rangers were being transported in international waters aboard the Ship.

11.     The segment of the Ship voyage in which the fire occurred originated in Singapore with an intended destination of Taiwan.

12.     A contract claim falls within admiralty jurisdiction if the principal objective of the contract is maritime commerce.

13. All of Ford's contract claims against the K-Line Group fall within the admiralty jurisdiction of this Court.

14. A tort incident falls within admiralty jurisdiction if it occurs on a navigable waterway, could potentially disrupt maritime commerce, and bears a substantial relationship to traditional maritime activity.

15. All of Ford's tort claims against the K-Line Group fall within the admiralty jurisdiction of this Court.

16. All of Ford's claims against the K-Line Group for the lack of seaworthiness of the Ship fall within the admiralty jurisdiction of this Court.

17. Venue is proper in this Court pursuant to the TSA's forum-selection clause, in which the parties irrevocably submit to the exclusive jurisdiction of the United States District Court for the Eastern District of Michigan, Southern Division in Detroit. Moreover, venue is proper in this admiralty action because valid service of process may be had on the K-Line Group.

## Factual Allegations

## Contract with the K-Line Group

18. The TSA consists of a Transportation Services Main Agreement, Ocean Carrier - Finished Vehicles, and eleven exhibits, including Non-manufacturer Global

Terms and Conditions for Non-production Goods and Services ("Global T&Cs"). A copy of the TSA is in the possession of the K-Line Group.

19.    The TSA provides standard terms and conditions for the provisioning of transportation services by the K-Line Group to FMC.

20.    The TSA imposes numerous obligations on the K-Line Group, including expressly warranting that its services will "be provided by appropriately qualified and trained personnel, with due care and diligence and to such high standards of quality as it is reasonable for the Buyer to expect in the circumstances."

21.    The TSA also obligates K-Line and KAM to properly transport, carry, bail, keep, care for, protect, and deliver Ford goods and products, and to deliver Ford goods and products in the same condition as when they first accepted custody and control of the Ford goods and products, including but not limited to the Ford Rangers.

22.    The TSA also provides the provisioning of transportation services by the K-Line Group to FMC.

23.    As evidenced by its designation as a consignee of the Ford Rangers, FLH was an intended third-party beneficiary of the TSA when the K-Line Group accepted possession of the Ford Rangers and at the time of the Ship fire.

24.     As an intended third-party beneficiary of the TSA, FLH had all the contractual rights, privileges, and protections of a contracting party at the time the K-Line Group accepted possession of the Ford Rangers and at the time of the Ship fire.

25.     FLH explicitly assigned all of its intended third-party beneficiary contractual privileges, as well as its other protections, rights, and claims pertaining to the loss of the Ford Rangers to FMC and provided notice of the assignment to the K-Line Group.

## K-Line Group

26.     K-Line is the ultimate parent of a group of international companies, including KAM and K-Line Management.

27.     K-Line and KAM were, at the time of the Ship fire and remain, corporate affiliates of each other, and are responsible for the performance of the TSA.

28.     K-Line and KAM share certain common management, personnel, policies, procedures, finances, resources, systems, and facilities to enable them to operate in a coordinated manner as contemplated by the TSA.

29.     K-Line Group's Ship Safety Promotion Committee ("K-Line Safety Committee") is the decision-making body that oversees safety for all K-Line

subsidiaries, affiliates, and related companies, and establishes accident prevention and safety measures for all ships operated by all K-Line subsidiaries, affiliates, and related companies — including owned, chartered, and entrusted vessels.

30.    K-Line's President & CEO chairs the K-Line Safety Committee.

31.    The K-Line Safety Committee established a set of quality guidelines for all ships operated by all K-Line subsidiaries, affiliates, and related companies – referred to as "KL-QUALITY."

32.    The K-Line Safety Committee established a safety equipment installation and operations policy called "K" Line-Drive to No Accident ("K-DNA"), which K-Line describes as safety guidelines that exceed legally mandated rules for all operating vessels, crew members, and maritime technical personnel.

33.    The K-Line Group utilizes its KL-QUALITY guidelines for vessel inspections to ensure that all shipowners and managers comply with the K-Line Group's own prescribed standards.

34.    The K-Line Group affirmatively and publicly represents that it operates, maintains, and manages ships pursuant to K-Line's ship safety programs, including but not limited to KL-QUALITY and K-DNA.

35.    As a result, the K-Line Group established its own heightened standard of care for the shipping operations of its subsidiaries, affiliates, and related companies, above and beyond that of applicable law or treaty.

36.    The Ship was not chartered, managed, staffed, operated, maintained, and documented in accordance with the K-Line Group's established ship safety programs, including but not limited to KL-QUALITY and K-DNA, and policies, procedures, and standards for ships operated, owned, and chartered by K-Line Group subsidiaries, affiliates, and related companies.

### Transportation and Destruction of the Ford Rangers

37.    K-Line Group accepted the 246 Ford Rangers for carriage at sea from Thailand to Taiwan in June 2019 ("Transport").

38.    The Ford Rangers were first transported from Thailand to Singapore on a ship registered under the name *Tianjin Highway*.  The Ford Rangers were transferred in Singapore to the Ship for shipment from Singapore to Taiwan ("Ship Voyage").

39.    The Ship was a "Roll On Roll Off / RoRo" car carrier registered in Panama under the name *Diamond Highway* and maritime call sign H8SX.  The Ship was classified IMO/LR No.  9293636 – gross 60,175, deadweight 19,086.

40.    The Ship was built by Mitsubishi Heavy Industries, Kobe, Japan in 2004 under MMSI No. 354487000.

41.    The Ship originated its voyage in Gothenburg, Sweden with an intended final destination of Japan.

42.    The Transport of the Ford Rangers aboard the Ship did not originate or conclude in a domestic United States port.

43.    K-Line Group was responsible for maintaining the seaworthiness of the Ship, as well as maintaining the Ship's documentary compliance, and operating the Ship in accordance with the TSA and the KL-QUALITY guidelines.

44.    K-Line Management operated, maintained, and managed the Ship at all times before and during the Ship Voyage, including at the time of the fire loss.

45.    A fire occurred aboard the Ship on June 15, 2019 while in route from Singapore to Taiwan.  The Ship's fire detection system detected a fire on a deck that did not contain Ford vehicles.  The fire then spread to the remainder of the Ship and cargo.

46.    The Ship's safety systems were inadequate, poorly maintained, and not fully operational.

47.     The Ship's fire suppression systems were not fully operational.  The water hydrant and hose and Hi-Ex foam installation fire suppression systems were not properly maintained and could not be used to extinguish the fire.

48.     The Ship's communication systems were not fully operational and prevented the Ship's crew from effectively communicating with the Ship's bridge regarding the fire response and containment.

49.     The Ship's crew did not properly respond to the fire.  The crew lacked proper training in fire risk assessment, fire suppression equipment, and firefighting.

50.     The Ship crew failed to use the Ship's fire suppression systems or other available firefighting equipment.  They instead used handheld fire extinguishers that were not designed to suppress this type of fire.

51.     The Ship crew improperly utilized the Ship's communication systems when attempting to communicate with the Ship's bridge.

52.     Rather than contain or suppress the fire, the Ship's crew abandoned the Ship in the early morning hours of June 16, 2019.

53.     The Ship crew notified the Philippine Coast Guard ("PCG") of the fire and advised it of the Ship's location north of Reed Bank, Kalayaan Island Group, West Philippine Sea.

54.     The PCG dispatched a vessel to locate the Ship and undertake search and rescue operations of the Ship crew.  The PCG located the Ship on June 17, 2019, near the Recto Bank (Reed Bank), Philippines, and PCG reported a fire aboard and that the crew had abandoned the Ship.

55.     Salvors responded to the PCG alert, but could not contain or suppress the fire and the combustible cargo burned out on its own.  Damage by fire and heat was extensive to all decks above the waterline, including the accommodations and the bridge.  The fire damaged or destroyed all 246 Ford Rangers.

56.     Salvors towed the Ship to the Keppel Subic Shipyard, Philippines.  The Ship was anchored at the PPC Pier, Puerto Princesa City, Palawan for post-fire inspection and stabilization repairs.  The Ship was repaired only sufficiently enough to keep it from foundering and sinking.  The Ship currently is anchored off the coast of Cebu, Philippines.

57.     The Ford Rangers were in good order and condition when delivered to the K-Line Group for Transport.  The value of the 246 Ford Rangers is estimated to exceed $7,200,000.

58.     The Ford Rangers were not delivered or otherwise returned to Ford's custody.  The Ford Rangers are not in the same good order and condition as at the

beginning of the Ship Voyage. To the contrary, all 246 Ford Rangers were physically damaged and determined to be a total loss.

**Conversion of the Ford Rangers**

59.     KAM notified FMC of the Ship fire on June 17, 2019.

60.     "The Japan Ship Owners' Mutual Protection & Indemnity Association" requested that Ford execute a Notice of Abandonment ("NOA") to abandon the Ford Rangers to the shipowner for removal and scrapping. Ford did not execute the NOA or otherwise abandon the Ford Rangers. As a result, Ford did not abandon, transfer, or waive its title in the Ford Rangers.

61.     On February 21, 2020, Ford was advised that the shipowner no longer controlled the Ship and cargo, including the Ford Rangers. Ford later learned that the Ship and cargo were sold "as is" to Philippine Precious Metal Resource Inc. ("PPMRI"), and that PPMRI intended to either scrap or salvage the Ship and cargo, including the Ford Rangers.

62.     PPMRI removed aluminum alloy wheels and other components from the Ship cargo, began dismantling the Ship, and moved the Ship into closer proximity of its facility to expedite scrapping and salvage operations.

63.     Any salvage of the Ford Rangers or components by PPMRI is an unauthorized conversion of Ford's property otherwise given in bailment to the K-Line Group.

64.     Due to the K-Line Group's actions, Ford has sustained losses that will be shown with specificity at trial, no part of which has been paid, although duly demanded, which are presently estimated to exceed $7,200,000.

## Statement of Claims

## Count One - Breach of Contract

65.     Ford repeats, reiterates, and realleges each and every allegation set forth in paragraphs 1 through 64, inclusive, as if herein set forth at length.

66.     FMC contracted with K-Line Group, which utilized KAM to execute the TSA on its behalf and assigned or delegated certain contractual performance to K-Line Management.

67.     The TSA also provides the provisioning of transportation services by the K-Line Group to FMC, with FMC's *related company* affiliates being intended third-party beneficiaries of the TSA.

68.     As a consignee of the Ford Rangers, FLH was an intended third-party beneficiary of the TSA when the K-Line Group accepted possession of the Ford Rangers and at the time of the Ship fire.

69.     As an intended third-party beneficiary of the TSA, FLH had all the contractual rights, privileges, and protections of a contracting party at the time the K-Line Group accepted possession of the Ford Rangers and at the time of the Ship fire.

70.     FLH explicitly assigned all of its intended third-party beneficiary claims pertaining to the loss of the Ford Rangers to FMC and provided notice of the assignment to the K-Line Group.

71.     The TSA imposes numerous obligations on the K-Line Group, including expressly warranting that its services will "be provided by appropriately qualified and trained personnel, with due care and diligence and to such high standards of quality as it is reasonable for the Buyer to expect in the circumstances."

72.     The TSA also obligates K-Line and KAM to properly transport, carry, bail, keep, care for, protect, and deliver Ford goods and products, and to deliver Ford goods and products in the same condition as when they first accepted custody and control of the Ford goods and products, including but not limited to the Ford Rangers.

73.     Pursuant to the TSA, K-Line and KAM owed a contractual duty to properly carry, bail, keep, care for, protect, and deliver the Ford Rangers in the same

good order and condition as at the time they first accepted custody and control of the Ford Rangers.

74.     K-Line and KAM breached their contractual duties by failing to provide transportation services that were "provided by appropriately qualified and trained personnel, with due care and diligence and to such high standards of quality as it is reasonable for the Buyer to expect in the circumstances."

75.     K-Line and KAM breached their contractual duties by failing to properly transport, carry, bail, keep, care for, protect, and deliver the Ford Rangers in the same good order and condition as at the time they first accepted custody and control of the Ford Rangers.

76.     As a direct and proximate result of K-Line's and KAM's breaches of contract, Ford has sustained losses that will be shown with more specificity at trial, no part of which has been paid, although duly demanded, which are presently estimated to exceed $7,200,000.

## Count Two - Breach of Bailment (Admiralty)

77.    Ford repeats, reiterates, and realleges each and every allegation set forth in paragraphs 1 through 76, inclusive, as if herein set forth at length.

78.    The Ford Rangers were delivered in good order and condition to K-Line for Transport.  FLH was consignee of the Ford Rangers at the time of the bailment.

79.    Independent of the contractual obligations under the TSA, K-Line and KAM had a duty to return the Ford Rangers to FMC, or FLH as its consignee, in good order and condition.

80.    K-Line and KAM, as bailee of the Ford Rangers, owed duties to properly carry, bail, keep, care for, protect, and deliver the Ford Rangers in the same good order and condition as at the time they first accepted custody and control of the Ford Rangers.

81.    K-Line and KAM breached their duties as bailees by failing to properly carry, bail, keep, care for, protect, and deliver the Ford Rangers in the same good order and condition as at the time they first accepted custody and control of the Ford Rangers.

82.     FLH explicitly assigned all of its admiralty claims pertaining to the loss of the Ford Rangers to FMC and provided notice of the assignment to the K-Line Group.

83.     As a direct and proximate result of K-Line's and KAM's failed bailment, Ford has sustained losses that will be shown with specificity at trial, no part of which has been paid, although duly demanded, which are presently estimated to exceed $7,200,000.

**Count Three - Lack of Seaworthiness (Admiralty)**

84.     Ford repeats, reiterates, and realleges each and every allegation set forth in paragraphs 1 through 83, inclusive, as if herein set forth at length.

85.     The Ford Rangers were delivered in good order and condition to K-Line for Transport.  FLH was consignee of the Ford Rangers at the time of delivery.

86.     Independent of the contractual obligations under the TSA, K-Line and KAM had a duty to return the Ford Rangers in good order and condition.

87.     Independent of the contractual obligations under the TSA, K-Line and KAM owed a duty to properly carry, keep, care for, protect, and deliver the Ford Rangers in the same good order and condition as at the time they first accepted custody and control of the Ford Rangers.

88.     Independent of the contractual obligations under the TSA, K-Line and KAM owed a duty to properly staff, maintain, and operate the Ship in good working order before and during the Ship Voyage while transporting the Ford Rangers.

89.     K-Line and KAM breached their duties by failing to properly staff, maintain, and operate the Ship in good working order before and during the Ship Voyage while transporting the Ford Rangers.

90.     Before and during the Ship Voyage, K-Line and KAM failed to exercise due diligence to retain a properly trained crew and make the Ship seaworthy.

91.     Before and during the Ship Voyage, the Ship and Ship crew were unfit to undertake the service in which they were engaged, including the Transport of the Ford Rangers.

92.     Before the Ship Voyage, K-Line and KAM knew, or should have known,  that the Ship's critical safety systems were not properly maintained, cared for, and were otherwise not fully operational, and not in compliance with applicable regulations, customs, and practices.

93.     Before the Ship Voyage, K-Line and KAM knew, or should have known, that the Ship's communication systems, water hydrant and hose, and Hi-Ex foam installation fire suppression systems were not fully operational.

94.     Before the Ship Voyage, K-Line and KAM knew, or should have known, that the Ship's crew were not properly trained in fire risk assessment, fire suppression equipment, and firefighting or in compliance with applicable regulations, customs, and practices.

95.     K-Line and KAM failed to exercise due diligence to make the Ship seaworthy based on their failure to maintain critical Ship safety systems in compliance with applicable regulations, customs, and practices, in violation of their duty to Ford to maintain the Ship's operational seaworthiness.

96.      K-Line and KAM failed to exercise due diligence to make the Ship seaworthy based on their failure to maintain critical Ship communication systems in compliance with applicable regulations, customs, and practices, in violation of their duty to Ford to maintain the Ship's operational seaworthiness.

97.     K-Line and KAM failed to exercise due diligence to make the Ship seaworthy based on their failure to properly train the Ship crew in fire risk assessment, fire suppression equipment, and firefighting in compliance with applicable regulations, customs, and practices, in violation of their duty to Ford to maintain the Ship's operational seaworthiness.

98.     Ford's loss of the Ford Rangers was caused by K-Line's and KAM's failure to exercise due diligence to make the Ship seaworthy at the commencement of and during the Ship Voyage.

99.     Ford's loss of the Ford Rangers was caused by the inability to contain or suppress the June 15, 2019 Ship fire, which directly resulted from the neglect and want of care of the Ship and Ship crew by K-Line and KAM.

100.   Ford's loss of the Ford Rangers resulted from causes within the privity and knowledge of K-Line and KAM, their officers, directors, managers, supervisors, superintendents, and other persons whose privity and knowledge are imputable to them.

101.   K-Line and KAM breached their duties by failing to deliver the Ford Rangers in the same good order and condition as at the time they first accepted custody and control of the Ford Rangers.

102.   FLH explicitly assigned all of its admiralty claims pertaining to the loss of the Ford Rangers to FMC and provided notice of the assignment to the K-Line Group.

103.   As a direct and proximate result of the lack of seaworthiness of the Ship and Ship crew, Ford sustained losses that will be shown with specificity at trial, no

part of which has been paid, although duly demanded, which are presently estimated to exceed $7,200,000.

## Count Four – Negligence

104.   Ford repeats, reiterates, and realleges each and every allegation set forth in paragraphs 1 through 103, inclusive, as if herein set forth at length.

105.   Independent of the contractual obligations under the TSA, the K-Line Group established its own heightened standard of care for the shipping operations of its subsidiaries, affiliates, and related companies, above and beyond that of applicable law or treaty.

106.   Independent of the contractual obligations under the TSA, the K-Line Group established a heightened standard of care based upon its affirmative representations regarding its ship safety programs, including but not limited to KL-QUALITY, K-DNA, and policies, procedures, and standards for ships operated by K-Line Group subsidiaries, affiliates, and related companies.

107.   The Ship was not chartered, managed, staffed, operated, maintained, and documented in accordance with K-Line's ship safety programs, including but not limited to KL-QUALITY and K-DNA, and policies, procedures, and standards for ships operated by K-Line Group subsidiaries, affiliates, and related companies — whether owned, chartered, or entrusted vessels.

108.   K-Line and KAM disregarded and failed to maintain critical Ship safety systems in compliance with applicable regulations, customs, and practices.

109.   K-Line and KAM disregarded and failed to maintain critical Ship safety systems in compliance with K-Line's ship safety programs, including but not limited to KL-QUALITY and K-DNA, and policies, procedures, and standards for ships operated by K-Line Group subsidiaries, affiliates, and related companies.

110.   The persistent and ongoing failure to maintain critical Ship safety systems in compliance with applicable regulations, customs, and practices violated K-Line Group's standards of care.

111.   K-Line and KAM failed to assure the retention of a Ship crew with proper training, and failed to properly train the Ship crew in fire risk assessment, fire suppression equipment, and firefighting in compliance with applicable regulations, customs, and practices.

112.   K-Line's and KAM's failure to assure the retention of a Ship crew properly trained in fire risk assessment, fire suppression equipment, and firefighting breached its standard of care.

113.   K-Line and KAM failed to assure the proper training of the Ship crew in fire risk assessment, fire suppression equipment, and firefighting in compliance

with applicable regulations, customs, and practices, which violated K-Line Group's standards of care.

114.   K-Line's and KAM's failure to assure the maintenance of critical Ship safety systems and a properly trained Ship crew breached the standard of care to maintain, care for, and protect the Ship crew, Ship, and cargo, and breached the standard of care to conduct general maritime activity in compliance with applicable regulations, customs, and practices.

115.   K-Line and KAM breached their duties by failing to deliver the Ford Rangers in the same good order and condition as at the time they first accepted custody and control of the Ford Rangers.

116.   FLH explicitly assigned all of its tort claims pertaining to the loss of the Ford Rangers to FMC and provided notice of the assignment to the K-Line Group.

117.   As a direct and proximate result of K-Line's and KAM's negligent failure to maintain critical Ship safety systems and a properly trained Ship crew, Ford has sustained losses that will be shown with specificity at trial, no part of which has been paid, although duly demanded, which are presently estimated to exceed $7,200,000.

## Count Five – In the Alternative, Gross Negligence (Admiralty)

118.   Ford repeats, reiterates, and realleges each and every allegation set forth in paragraphs 1 through 117, inclusive, as if herein set forth at length.

119.   Independent of the contractual obligations under the TSA, K-Line and KAM owed a duty to maintain, care for, and protect the Ship crew, Ship, and cargo, and to conduct general maritime activity in compliance with applicable maritime regulations, customs, and practices.

120.   K-Line and KAM acted in a grossly negligent manner by disregarding and breaching the standard of care to maintain, care for, and protect the Ship crew, Ship, and cargo, and the standard of care to conduct general maritime activity in compliance with applicable maritime regulations, customs, and practices.

121.   The failure of K-Line and KAM to retain a properly trained crew and correct multiple deficiencies to the Ship's critical safety systems reflects a conscious disregard of the maritime standard of care to maintain, care for, and protect the Ship crew, Ship, and cargo.

122.   The failure of K-Line and KAM to retain a properly trained crew and correct multiple deficiencies to the Ship's critical safety systems was so reckless that it demonstrates a substantial lack of concern for injury to the Ship crew, Ship, and cargo.

123.   Reasonable minds would conclude that the failure by K-Line and KAM to retain a properly trained crew and correct multiple deficiencies of the Ship's critical safety systems demonstrate a conscious disregard of the maritime standard of care and a substantial lack of concern for injury to the Ship crew, Ship, and cargo.

124.   K-Line and KAM acted in a grossly negligent manner by failing to retain a Ship crew that was properly trained in fire risk assessment, fire suppression equipment, and firefighting, in accordance with applicable maritime regulations, customs, and practices.

125.   K-Line and KAM failed to retain a Ship crew with proper training, and failed to properly train the Ship crew in fire risk assessment, fire suppression equipment, and firefighting in compliance with applicable maritime regulations, customs, and practices.

126.   K-Line and KAM acted in a grossly negligent manner by consciously disregarding maintenance of critical Ship safety systems in compliance with applicable maritime regulations, customs, and practices.

127.   K-Line and KAM acted in a grossly negligent manner by failing to assure that the Ship's communication systems were fully operational, so as not to impair the Ship crew's ability to advise and receive instruction from the bridge regarding the fire.

128.   K-Line and KAM acted in a grossly negligent manner by failing to assure that the Ship's water hydrant and hose were fully operational.

129.   K-Line and KAM acted in a grossly negligent manner by failing to assure that the Ship's Hi-Ex foam installation fire suppression system was fully operational.

130.   K-Line's and KAM's failure to maintain critical Ship safety systems in compliance with applicable maritime regulations, customs, and practices was a grossly negligent breach of their standards of care.

131.   The failure to maintain critical Ship safety systems, communication systems, and retain a properly trained Ship crew created an unjustifiably high risk of harm that was either known, or so obvious that it should have been known, to K-Line and KAM.

132.   The disregard of critical Ship safety systems, communication systems, and an improperly trained Ship crew created an unjustifiably high risk of harm to the Ship crew, Ship, cargo, and general maritime activity.

133.   K-Line and KAM acted in a grossly negligent manner in their conscious disregard of retaining a Ship crew properly trained in fire risk assessment, fire suppression equipment, and firefighting in compliance with applicable maritime regulations, customs, and practices.

26

134.   K-Line and KAM were grossly negligent by failing to provide proper training of the Ship crew in fire risk assessment, fire suppression equipment, and firefighting in compliance with applicable maritime regulations, customs, and practices, and the breach of their standards of care.

135.   K-Line's and KAM's conscious disregard of critical Ship safety systems, communication systems, and an improperly trained Ship crew grossly breached the standard of care to maintain, care for, and protect the Ship crew, Ship, and cargo, and grossly breached the standard of care to conduct general maritime activity in compliance with applicable maritime regulations, customs, and practices.

136.   K-Line and KAM breached their duties by failing to maintain, care for, and protect the Ship crew, Ship, and cargo, and to conduct general maritime activity in compliance with applicable maritime regulations, customs, and practices.

137.   K-Line's and KAM's breaches were so reckless so as to demonstrate that K-Line and KAM had a substantial lack of concern for whether an injury would result to the Ship crew, Ship, and cargo.

138.   K-Line and KAM breached their duties by conduct that was so reckless so as to rise to gross negligence in the maintenance, care, and protection of the Ship crew, Ship, and cargo, and the conduct of maritime activity in compliance with applicable maritime regulations, customs, and practices.

139.    Exculpatory clauses in maritime contracts are generally not enforceable based on the gross negligence of K-Line and KAM in failing to maintain critical Ship safety systems and retain a properly trained Ship crew.

140.    FLH explicitly assigned all of its tort claims pertaining to the loss of the Ford Rangers to FMC and provided notice of the assignment to the K-Line Group.

141.    As a direct and proximate result of K-Line's and KAM's gross dereliction and disregard of critical Ship safety systems and an improperly trained Ship crew, Ford sustained losses that will be shown with specificity at trial, no part of which has been paid, although duly demanded, which are presently estimated to exceed $7,200,000.

## Count Six – Silent Fraud Against K-Line and KAM

142.    Ford repeats, reiterates, and realleges each and every allegation set forth in paragraphs 1 through 141, inclusive, as if herein set forth at length.

143.    K-Line and KAM owed a duty to Ford to properly carry, keep, care for, protect, and deliver the Ford Rangers in the same good order and condition as at the time they first accepted custody and control of the Ford Rangers.

144.    K-Line and KAM owed a duty to maintain, care for, and protect the Ship crew, Ship, and cargo, and to conduct general maritime activity in compliance with applicable regulations, customs, and practices.

145.   Before the Ship Voyage, K-Line and KAM knew, or should have known, that the Ship's critical safety systems were not properly maintained, cared for, or were otherwise not fully operational in compliance with applicable regulations, customs, and practices.

146.   Before the Ship Voyage, K-Line and KAM knew, or should have known, the Ship's communication systems were not fully operational, impairing the Ship crew's ability to advise and receive instruction from the bridge regarding the fire.

147.   Before the Ship Voyage, K-Line and KAM knew or should have known, that the Ship's water hydrant and hose were not fully operational.

148.   Before the Ship Voyage, K-Line and KAM knew or should have known, that the Ship's Hi-Ex foam installation fire suppression system was not fully operational.

149.   Before the Ship Voyage, K-Line and KAM failed to advise Ford of any known risks of voyage or patent operational issues with the Ship.

150.   Based upon the K-Line's affirmative representations of its ship safety programs, including but not limited to KL-QUALITY and K-DNA, and policies, procedures, and standards for ships operated by K-Line Group subsidiaries, affiliates, and related companies, K-Line and KAM owed a duty of candor to Ford

29

to advise Ford of any known risks of voyage or patent operational issues with the Ship.

151.   K-Line and KAM remained silent, or otherwise actively suppressed, their failure to maintain critical Ship safety systems in compliance with applicable regulations, customs, and practices, in violation of their duty of candor to advise Ford of any known risks of voyage or patent operational issues with the Ship.

152.   Before the Ship Voyage, K-Line and KAM knew or should have known, that the Ship crew were not properly trained in fire risk assessment, fire suppression equipment, and firefighting in compliance with applicable regulations, customs, and practices.

153.   K-Line and KAM remained silent, or actively suppressed, their failure to properly train the Ship crew in fire risk assessment, fire suppression equipment, and firefighting in compliance with applicable regulations, customs, and practices, in violation of their duty of candor to advise Ford of any known risks of voyage or patent operational issues with the Ship.

154.   K-Line and KAM breached their duties to Ford by failing to disclose to Ford the known risks of voyage or patent operational issues with the Ship and Ship crew at the time they accepted custody and control of the Ford Rangers, and before the Ship Voyage.

155.   As a direct and proximate result of K-Line's and KAM's silence and suppression of the lack of safety and seaworthiness of the Ship and Ship crew from Ford before the Ship Voyage, Ford sustained losses that will be shown with specificity at trial, no part of which has been paid, although duly demanded, which are presently estimated to exceed $7,200,000.

## Prayer for Relief

WHEREFORE, Plaintiff FMC demands judgment in its favor and relief, in an amount to exceed $7,200,000, against K-Line Group, joint and severally, as follows:

1.   Entry of judgment in favor of FMC for breach of contract;

2.   Entry of judgment in favor of FMC for breach of bailment under admiralty law;

3.   Entry of judgment in favor of FMC for lack of seaworthiness under admiralty law;

4.   Entry of judgment in favor of FMC for negligence;

5.   Entry of judgment in favor of FMC in the alternative for gross negligence under admiralty law;

6.   Entry of judgment in favor of FMC for silent fraud;

7.   An award of damages to FMC for losses sustained as a result of breach of contract;

8.   An award of damages to FMC for losses sustained as a result of breach of bailment under admiralty law;

9.   An award of damages to FMC for losses sustained as a result of K-Line's and KAM's failure to maintain the seaworthiness of the Ship and Ship crew under admiralty law;

31

10. An award of damages to FMC for losses sustained as a result of K-Line's and KAM's negligence;

11. An award of damages to FMC in the alternative for losses sustained as a result of K-Line's and KAM's gross negligence under admiralty law;

12. An award of damages to FMC for losses sustained as a result of K-Line's and KAM's silent fraud;

13. Reasonable prejudgment interest from the date amounts owed became due;

14. Costs, expenses, and attorneys' fees; and

15. Any other legal and equitable relief as may be available under law that the Court finds just and proper.

DYKEMA GOSSETT PLLC


By: */s/Lisa A. Brown*
    Lisa A. Brown (P67208)
    400 Renaissance Center
    Detroit, MI 48243
    (313) 568-6800
    lbrown@dykema.com

    *and*

    BRADLEY ARANT BOULT
    CUMMINGS LLP
    Katherine J. Henry
    *(admission to be sought)*
    1615 L Street NW, Ste 1350
    Washington, D.C.  20036
    (202) 719-8244
    khenry@bradley.com

BRADLEY ARANT BOULT
CUMMINGS LLP
David Vance Lucas
*(admission to be sought)*
300 Clinton Avenue West, Suite 900
Huntsville, AL 35801
(256) 517-5131
dlucas@bradley.com

*Attorneys for Plaintiff Ford Motor
Company*

Dated: January 15, 2021