UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FORD MOTOR COMPANY,

                    Plaintiff,                    Case No. 21-cv-10119

v.                                                Paul D. Borman
                                                  United States District Judge
KAWAKAKI KISEN KAISHA LTD.,
"K" LINE AMERICA, INC., and
"K" LINE RORO BULK SHIP
MANAGEMENT CO., LTD.,

                    Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANT "K" LINE RORO
BULK SHIP MANAGEMENT CO., LTD.'S MOTION TO DISMISS
COMPLAINT FOR LACK OF PERSONAL JURISDICTION PURSUANT
TO FED. R. CIV. P. 12(b)(2) (ECF NO. 29)**

Plaintiff Ford Motor Company, on its own behalf and on behalf of assignee

Ford Lio Ho Motor Company, Ltd. (collectively, Ford), brings this action against

Defendants Kawasaki Kisen Kaisha Ltd. (K-Line), "K" Line America, Inc. (KAM),

and "K" Line RoRo Bulk Ship Management Co., Ltd. (KRBS), alleging claims for

breach of contract, bailment, tort, and admiralty. Ford entered into a Transportation

Services Main Agreement (TSA) with K-Line for the ocean transportation of certain

Ford automobiles aboard roll-on roll-off car carrier ships. Ford seeks to recover

1

amounts owed for 246 Ford Ranger pickup trucks destroyed in a marine fire aboard an ocean-going car carrier ship Ford alleges was chartered, managed, staffed, operated, maintained, and documented by the three K-Line Defendants. Defendants K-Line and KAM have appeared and filed an Answer to Plaintiff Ford's First Amended Complaint.

Now before the Court is Defendant "K" Line RoRo Bulk Ship Management Co., Ltd.'s Motion to Dismiss for Lack of Personal Jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) (ECF No. 29). Ford filed a Response in opposition, and KRBS filed a Reply brief. (ECF Nos. 31, 35.) Following a period of Court-ordered jurisdictional discovery, the parties filed supplemental briefs. (ECF Nos. 54, 57, 58, 59.) KRBS's motion to dismiss is therefore fully briefed. The Court does not believe that oral argument will aid in its disposition of this matter; therefore, it is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f)(2).

For the reasons that follow, the Court GRANTS Defendant KRBS's motion and DISMISSES Defendant KRBS for want of personal jurisdiction.

# I.  FACTUAL AND PROCEDURAL BACKGROUND

## A.  Relevant Facts

### 1.  The parties

Plaintiff Ford Motor Company is a Delaware corporation with its principal place of business in Michigan. (ECF No. 16, Plaintiff's First Amended Complaint (FAC) ¶ 1.)

Ford Lio Ho Motor Company (FLH) has its principal place of business in Taiwan and was the consignee of the 246 Ford Rangers at the time of the fire loss. FLH has assigned all of its claims for the loss of the Ford Rangers to Ford Motor Company and provided notice of the assignment to K-Line Group. (*Id.* ¶ 2.)

Defendant Kawasaki Kisen Kaisha Ltd. (K-Line) is a Japanese corporation, and the ultimate parent corporation of a group of transportation-related companies, including Defendants "K" Line America, Inc. (KAM) and "K" Line RoRo Bulk Ship Management Co., Ltd. (KRBS). (*Id.* ¶ 3.)

Defendant KAM is a wholly-owned United States subsidiary of K-Line, incorporated and qualified as a for-profit corporation in the State of Michigan, and designated as the North American General Agent for K-Line. (*Id.* ¶ 4.) KAM supports K-Line's business operations in the ocean carrier shipping sector in America. (*Id.*)

3

Defendant KRBS is a wholly-owned subsidiary of K-Line, headquartered in Kobe, Japan, and is one of two ship management subsidiaries of K-Line. KRBS's predecessor, Taiyo Kaiun Kabushiki Kaisha (TKKK), became an affiliate of K-Line through a government-mandated consolidation of the maritime industry in Japan in 1964, and became a wholly-owned subsidiary of K-Line in 2000. TKKK changed its name to KRBS in 2018. (*Id.* ¶ 5) (ECF No. 29, KRBS Mot. Dismiss at p. 1, PageID.443.) KRBS manages car and dry bulk carriers chartered by K-Line, including "Roll On Roll Off" (a/k/a RoRo) vessels and a ship called the *Diamond Highway*, the Ship transporting the 246 Ford Rangers at the time of the ship fire. (ECF No. 16, FAC ¶ 5.)

### 2. The contracts: Time Charter Agreement, SMA, and TSA

### a. The 2013 Time Charter Agreement

In September 2013, K-Line time chartered a ship known as the *Diamond Highway* from Diamond Car Carriers, S.A. (Diamond), a Panamanian company, to transfer cargo for K-Line. (ECF No. 29-1, Declaration of Koji Himeda (Himeda Decl.) ¶ 19, PageID.477.) (ECF No. 19-3, Time Charter Agreement.) KRBS explains that under a time charter, the vessel owner, in this case Diamond, charters the vessel to the charterer, here K-Line, for a set period of time, and the charterer uses the vessel to carry the cargo of its customers and directs the vessel to sail to specified

4

ports to load and deliver cargo. (ECF No. 29, KRBS Mot. Dismiss at PageID.446-47.) While the vessel's owner generally employs the crew and manages and operates the chartered vessel, many vessel owners hire professional ship managers to manage and operate the vessel. (*Id.*)

### b.   The 2013 Ship Management Agreement (SMA)

K-Line and Diamond agreed that KRBS would manage the *Diamond Highway*, and Diamond and KRBS entered into a Ship Management Agreement (SMA) in September 2013, under which KRBS would manage the *Diamond Highway*. (ECF No. 29-1, Himeda Decl. ¶ 19, PageID.477) (ECF No. 29-3, SMA.)[1] KRBS negotiated and entered the SMA directly with Diamond. (ECF No. 29-1, Himeda Decl. ¶ 19, PageID.477.)

The SMA delegated the operational and management responsibilities of the Ship, including safety obligations, from Diamond to KRBS. (ECF No. 29-3, SMA ¶ 4, PageID.484.) The SMA required KRBS to provide competent personnel to

---

[1] KRBS manages 87 vessels – 11 of those vessels are owned by third parties and time chartered by K-Line; 75 vessels are owned by K-Line or its subsidiaries; and one vessel is jointly owned by K-Line and KRBS, with K-Line owning 90% and KRBS owning 10%. (ECF No. 29-1, Himeda Decl. ¶ 8, PageID.475.) Thus, all vessels KRBS manages are owned, time-chartered, or co-owned by K-Line. K-Line owns or co-owns a total of 446 vessels. (ECF No. 29-1, Himeda Decl. ¶ 10, PageID.475.)

supervise the maintenance of the Ship, and to ensure that the crew were "fully experienced in handling and operating this size and type of vessel," and that the crew received appropriate training. (*Id.* ¶¶ 4-5, PageID.484-85.) Defendant KRBS asserts that its operational responsibilities include maintaining Documents of Compliance and developing the Safety Management System for each vessel it manages. (ECF No. 29, KRBS Mot. Dismiss at PageID.445.) The SMA contains a forum selection clause that requires Tokyo arbitration for any disputes. (ECF No. 54-2, Declaration of Sohachi Takimoto (Takimoto Decl.) ¶ 7, PageID.1430.) The SMA also contains an integration clause providing that the agreement "constitutes the entire agreement between the parties" and that any modification must be in writing. (ECF No. 29-3, SMA ¶ 25, PageID.497.)

### c. The 2019 Transportation Services Main Agreement (TSA)

Effective January 1, 2019, Plaintiff Ford entered into a Transportation Services Main Agreement (TSA) with Defendant K-Line. (ECF No. 19-2, TSA.) Defendant KAM executed the TSA on K-Line's behalf, and the TSA identified KAM as the party to be served with any notice of claims or breach. (*Id.*) (ECF No. 16, FAC ¶ 4.)

6

The TSA sets general terms and conditions between K-Line and Ford for the transportation of Ford vehicles on K-Line owned or chartered vessels. (ECF No. 19-2, TSA T&C ¶ 1, PageID.281.) The TSA provides that the "Carrier [K-Line] shall provide to Shipper [Ford] all services necessary to accomplish the transportation of unboxed passenger and commercial automotive vehicles by ocean vessel" to their intended destination. (*Id.*) The TSA contains a broad integration clause providing that the TSA, with all of its exhibits and attachments, "constitutes the entire understanding of the parties in connection with its subject matter…." (*Id.* ¶ 13, PageID.282-83.)

The TSA expressly incorporates several exhibits, including Ford's Global Terms and Conditions for Non-Production Goods and Services. (*Id.* at PageID.280, 285-99.) The TSA, in the Global Terms and Conditions, contains a forum selection clause providing:

> (d) <u>Litigation</u>. …. In any litigation, the parties agree that the litigation will be filed only in the courts of the country in which the Buyer has its principal place of business, regardless of where the Seller may be located or the Supplies may have been designed, manufactured, sold or delivered….
>
> (e) <u>Principal Place of Business in the U.S.</u> If the principal place of business of the Buyer is in the United States, each party will, in any litigation brought under Section 26(d):

(i) irrevocably submit to the exclusive jurisdiction of: (1) the United States District Court for the Eastern District of Michigan, Southern Division in Detroit, as to any claim or proceeding over which it may have jurisdiction; or, (2) the Circuit Court for the County of Oakland, Michigan (6th Circuit – Pontiac) as to all other claims or proceedings;

(ii) Expressly waive any objection to venue or jurisdiction, including an objection based on the inconvenience of the forum; and

(iii) Not seek or accept any award of punitive, exemplary or multiple damages other than a right to recover them under the indemnification provisions in Section 12.

(ECF No. 19-2, TSA, ¶ 26(d), (e), PageID.297.)

Ford further points out that the TSA also expressly incorporates K-Line's Bill of Lading. (*Id.* at PageID.280, 309-60.) That Bill of Lading provides, in relevant part:

Neither the Carrier nor any corporation owned by subsidiary to or associated or affiliated with the Carrier shall be liable to answer for or make good any loss or damage to the goods occurring at any time and even through before loading on or after discharge from the ship by reason or by means of any fire whatsoever unless such fire shall be caused by the design, neglect, fault or privity of its directors or managers.

(*Id.* PageID.360.)[2]

---

[2] As KRBS points out in its reply in support of its supplemental brief, Ford misleadingly misquotes this paragraph in its Response brief several times by deliberately omitting the first four words of the paragraph – "Neither the Carrier nor"

### 3.   Transportation and destruction of 246 Ford Ranger pickup trucks aboard the *Diamond Highway* in June 2019

In June 2019, K-Line accepted from Ford 246 Ford Ranger pickup trucks for transport from Thailand to Taiwan, pursuant to the parties' TSA. (ECF No. 16, FAC ¶ 62.) The Ford Rangers were first transported from Thailand to Singapore on a ship registered under the name *Tianjin Highway*, and then transferred in Singapore to the *Diamond Highway* for shipment from Singapore to Taiwan. (*Id.* ¶ 63.) A fire occurred aboard the *Diamond Highway* on June 15, 2019, while it was en route to Taiwan. (*Id.* ¶ 74.) According to Ford, the Ship's fire detection system detected a fire on a deck that did not contain the Ford Rangers, and the fire then spread to the remainder of the Ship and cargo, including the Ford Rangers. (*Id.*)

Ford alleges that the *Diamond Highway's* safety systems, including the fire suppression systems, were inadequate, poorly maintained, and not fully operational. (ECF No. 16, FAC ¶¶ 75-76.) Ford further claims that the Ship's communication systems were not fully operational and prevented the Ship's crew from effectively communicating with the Ship's bridge regarding the fire response and containment. (*Id*. ¶ 77.) In addition, the Ship's crew did not properly respond to the fire because

_____

– which changes the meaning of this paragraph. (See, e.g., ECF No. 58, Ford Resp. at PageID.1603.)

the crew lacked proper training in fire risk assessment, fire suppression equipment, and firefighting, and the crew failed to use the Ship's fire suppression systems or other available firefighting equipment. (*Id*.)

The *Diamond Highway's* crew ultimately abandoned the Ship in the early morning hours of June 16, 2019. (*Id.* ¶ 81.) Ford alleges that due to all of these failures, the 246 Ford Ranger pickup trucks were damaged or destroyed and determined to be a total loss. (*Id*. ¶¶ 85, 89.) Ford subsequently learned that the Ship and its cargo were sold "as is" for salvage or scrap, and Ford claims it has sustained losses estimated to exceed $7,200,000.00 (*Id.* ¶¶ 93-98.)

## B.    Procedural History

Plaintiff Ford initiated this action on January 15, 2021, with a complaint filed against Defendants K-Line and KAM. (ECF No. 1, Complaint.) Both defendants were served, and they filed an Answer on May 9, 2021. (ECF No. 9, Answer.)

On May 28, 2021, Plaintiff Ford filed a First Amended Complaint, adding KRBS as a defendant. (ECF No. 16, FAC.) Ford alleges six claims in its FAC against all three defendants (collectively, the K-Line Group): (1) Count One – Breach of Contract; (2) Count Two – Breach of Bailment (Admiralty); (3) Count Three – Lack of Seaworthiness (Admiralty); (4) Count Four – Negligence; (5) Count Five – In the

Alternative, Gross Negligence (Admiralty); and (6) Count Six – Silent Fraud Against K-Line and KAM. (*Id.*)

On June 25, 2021, Defendants K-Line and KAM filed an Answer to the FAC. (ECF No. 19, Answer to FAC.)

On September 13, 2021, Defendant KRBS filed the instant motion to dismiss Plaintiff's FAC against it pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction. (ECF No. 29, KRBS Mot. Dismiss.) KRBS contends that Ford asks the Court to assert personal jurisdiction over KRBS on the grounds that KRBS is an alter ego of its parent company, K-Line, and therefore is bound by the forum selection clause in the TSA between Ford and K-Line. KRBS argues that Ford fails to plead the essential elements of an alter ego theory, and thus Ford's First Amended Complaint against KRBS should be dismissed for want of personal jurisdiction under Fed. R. Civ. P. 12(b)(2).

Plaintiff Ford filed a Response in opposition to KRBS's motion to dismiss. (ECF No. 31, Ford Resp. Mot. Dismiss.) Ford states that it does not make an alter ego claim against Defendant KRBS in its FAC, and instead argues that this Court has jurisdiction over KRBS because KRBS "carried out material duties and obligations under the TSA" and thus its conduct is "closely related" to the parties' contractual dispute. Ford further contends that KRBS, as a wholly-owned subsidiary

11

vertically integrated with K-Line, is "closely related" to K-Line, and that all of this serves to sufficiently bind KRBS to the forum selection clause and jurisdictional waiver in the TSA, even though KRBS did not sign that agreement.

Defendant KRBS filed a Reply brief in support of its motion to dismiss. (ECF No. 35, KRBS Reply Mot. Dismiss.) KRBS argues that the "closely related" doctrine does not apply in this case based on the terms of the three stand-alone contracts at issue in this case: (1) the 2013 SMA between KRBS and Diamond, which does not mention K-Line; (2) the 2013 Time Charter between Diamond and K-Line, which KRBS states merely identifies it as the vessel manager; and (3) the 2019 TSA between Ford and K-Line. KRBS disputes that it is "closely related" to K-Line with respect to Ford's claims in this case. KRBS asserts that its sole contractual relationship in this matter is the SMA with Diamond, executed in 2013, and that it had no knowledge of the subsequently-entered 2019 TSA between Ford and K-Line, or the forum selection clause in that agreement.

On the same day that Plaintiff Ford filed its Response in opposition to Defendant KRBS's motion to dismiss, it also filed a Motion for Leave to Conduct Limited Jurisdictional Discovery. (ECF No. 32, Ford Mot. Discovery.) That motion was fully briefed. (ECF Nos. 38, 40.)

On March 28, 2022, this Court entered an Order Granting Plaintiff Ford Motor Company's Motion for Leave to Conduct Limited Jurisdictional Discovery as to the Court's Jurisdiction Over KRBS. (ECF No. 32, Order.)

The parties then engaged in written discovery, including the presentment and response to interrogatories and requests for production of documents. Because KRBS is situated in Japan, however, most documents produced in discovery were produced in their native Japanese. The parties coordinated translation of these documents, which translation was completed in December 2022.

Following discovery, and pursuant to a stipulated order, the parties provided supplemental briefing to the Court regarding KRBS's Motion to Dismiss. Defendant KRBS filed its supplemental brief, supported by two declarations of KRBS Directors and Managing Officers. (ECF No. 54, KRBS Supp. Brief.) Plaintiff Ford filed a Response to the supplemental brief (ECF Nos. 57, 58(sealed), Ford Supp. Resp.), and Defendant KRBS filed a Reply brief in support of its supplemental brief (ECF No. 59, KRBS Supp. Reply).

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(2) provides for dismissal of a complaint for lack of personal jurisdiction over a party. The party asserting the existence of personal jurisdiction bears the burden of making at least a prima facie showing of its

13

existence. *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1261-62 (6th Cir. 1996); *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997). "Without personal jurisdiction over an individual ... a court lacks all jurisdiction to adjudicate that party's right, whether or not the court has valid subject matter jurisdiction." *Friedman v. Estate of Presser*, 929 F.2d 1151, 1156 (6th Cir. 1991).

The Court has three options when faced with a motion to dismiss for lack of personal jurisdiction. The court may: (1) decide the motion on affidavits alone; (2) permit discovery to help rule on the motion; or (3) conduct an evidentiary hearing to decide any remaining factual questions. *Theunissen v. Matthews,* 935 F.2d 1454, 1458 (6th Cir. 1991) (citing *Serras v. First Tenn. Bank Nat'l Ass'n,* 875 F.2d 1212, 1214 (6th Cir. 1989)). Although the plaintiff always bears the burden of establishing that jurisdiction exists, the method selected by the court to resolve the issue will affect the weight of that burden. *Id.*

When the Court relies on written submissions and affidavits rather than holding an evidentiary hearing to resolve a Rule 12(b)(2) motion, the burden on plaintiff is "relatively slight" and the court must view the evidence in the light most favorable to the plaintiff. *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007). "[P]laintiff must make only a *prima facie* showing that personal jurisdiction exists in order to defeat dismissal." *Theunissen*, 935 F.2d at

14

1458. A plaintiff can meet this burden by "establishing with reasonable particularity sufficient contracts between [the defendant] and the forum state to support jurisdiction." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002) (quoting *Provident Nat'l Bank v. California Fed. Sav. Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987)).

Importantly, when a court resolves the issue as to whether it has personal jurisdiction based on written submissions alone, the plaintiff "may not rest on [its] pleadings to answer the movant's affidavits, but must set forth, 'by affidavit and otherwise[,] … specific facts showing that the court has jurisdiction.'" *Serras*, 875 F.2d at 1214 (quoting *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 930 (6th Cir. 1974)). "Dismissal in this procedural posture is proper only if all the specific facts which the plaintiff … alleges collectively fail to state a *prima facie* case for jurisdiction." *CompuServe*, 89 F.3d at 1262. If an evidentiary hearing is held, the plaintiff must demonstrate that jurisdiction is proper by a preponderance of the evidence. *Theunissen,* 935 F.2d at 1465.

While a motion to dismiss would normally be converted to a motion for summary judgment by asking the court to consider additional documents, a Rule 12(b)(2) motion "mirrors in some respects the procedural treatment given to a

15

motion for summary judgment." *Id.* at 1459. As the Sixth Circuit Court of Appeals

has explained:

> Motions to dismiss under Rule 12(b)(2) involve burden shifting. The plaintiff must first make a prima facie case, which can be done merely through the complaint. The burden then shifts to the defendant, whose motion to dismiss must be properly supported with evidence. Once the defendant has met the burden, it returns to the plaintiff, who may no longer stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction.

*Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 504 (6th Cir. 2020) (internal

quotation marks and citations omitted). Unlike a motion for summary judgment,

though, a court may not "weigh the controverting assertion[;]" rather, if facts

proffered by the defendant conflict with those offered by the plaintiff, a district court

does not consider them. *Theunissen,* 935 F.2d at 1459; *Aristech Chem. Int'l Ltd. v.*

*Acrylic Fabricators Ltd.,* 138 F.3d 624, 626 (6th Cir. 1998).

## III.  ANALYSIS

### A.    Personal Jurisdiction

A court has personal jurisdiction over an out-of-state defendant if the

defendant is amenable to service of process under the state's long-arm statute, and

if the exercise of personal jurisdiction would not deny the defendant due process.

*Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 954 F.2d

1174, 1176 (6th Cir. 1992). Michigan interprets its long-arm statute to allow

personal jurisdiction to extend to the limits imposed by the federal constitution, which has the effect of collapsing the two questions into one. *Id.*

To comply with due process, "out-of-state defendants" must "have 'minimum contacts' with the forum state sufficient to comport with 'traditional notions of fair play and substantial justice.'" *Blessing v. Chandrasekhar*, 988 F.3d 889, 905 (6th Cir. 2021) (*quoting International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Personal jurisdiction can be either specific or general. *Air Products & Controls, Inc.*, 503 F.3d at 549-50. Specific jurisdiction "grants jurisdiction only to the extent that a claim arises out of or relates to a defendant's contacts in the forum state," whereas general jurisdiction "depends on continuous and systematic contact with the forum state." *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 679 (6th Cir. 2012).

KRBS argues, and Ford does not disagree, that KRBS has no contacts with Michigan – it has never had an office or employees in the United States; it does not advertise or market its services to potential customers in the United States; it has not managed any vessels owned by United States companies; it owns no property in the United States and pays no income or property taxes to the United States or any state government; and it has no United States-based phone or fax numbers, and has no United States mailing address. (ECF No. 29-1, Himeda Decl. ¶ 5, PageID.474.).

17

However, the requirement that a court have personal jurisdiction over a party is a waivable right. *Preferred Cap., Inc. v. Assocs. in Urology*, 453 F.3d 718, 721 (6th Cir. 2006). For example, parties may agree in advance to submit to the jurisdiction of a particular court by way of a forum selection clause in a commercial contract, which generally will be enforced "absent a strong showing that it should be set aside." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972). Michigan's general personal jurisdiction statute for corporations allows courts to exercise jurisdiction over a corporation if the corporation consents to personal jurisdiction. Mich. Comp. Laws § 600.711(2). Thus, "a foreign corporation may consent to Michigan jurisdiction through a valid forum selection and choice of law clause." *Belanger, Inc. v. Car Wash Consultants, Inc.*, 452 F. Supp. 2d 761, 764 (E.D. Mich. 2006) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 n.14 (1985)); *see also Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 946 F. Supp. 2d 714, 718-19 (E.D. Mich. 2013). Further, forum selection clauses in the admiralty context "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen*, 407 U.S. at 10.

In this case, Plaintiff Ford alleges that Defendant K-Line consented to personal jurisdiction in this Court because it is a party to the TSA, which contains a

forum selection clause. (ECF No. 16, FAC ¶ 22.) Ford pleads that Defendant KAM is incorporated in Michigan and is therefore subject to this Court's general jurisdiction. (*Id.*) Defendants K-Line and KAM have appeared and filed Answers to both Plaintiff's original Complaint and its First Amended Complaint, and do not contest jurisdiction. (ECF Nos. 9, 19.)

Plaintiff Ford argues that Defendant KRBS, although not a signatory to the TSA, is nevertheless bound by the forum selection clause contained in that contract between Ford and K-Line, and therefore a minimum contacts jurisdictional analysis is not appropriate in this case. Ford argues instead that this Court has jurisdiction over KRBS because KRBS's conduct is "closely related" to the parties' contractual dispute and because of KRBS's close relationship to K-Line.[3]

---

[3] Defendant KRBS principally argues in its Motion to Dismiss that dismissal is appropriate because KRBS is not the "alter ego" of its parent company and corporate affiliate, K-Line. (See ECF No. 29, KRBS Mot. Dismiss.) However, Ford expressly states in its Response to that Motion that Ford "does not make an alter ego claim" in its Complaint, and instead alleges in Paragraph 22 of the FAC that this Court has jurisdiction over KRBS because it is "closely related" to the parties' contractual dispute and to K-Line. (ECF No. 31, Ford Resp. Mot. Dismiss at PageID.815, citing FAC ¶ 22.) The parties' supplemental briefing, following the close of jurisdictional discovery, focuses solely on the "closely related" analysis. Accordingly, the Court need not address the alter ego arguments raised in Defendant KRBS's Motion to Dismiss.

**B.    Application of Contractual Forum Selection Clauses to Non-Signatories**

Plaintiff Ford argues that the Sixth Circuit Court of Appeals and courts within this Circuit have recognized that a non-signatory to a forum selection clause may be bound to that forum selection clause when the non-signatory is "'closely related' to the dispute such that it was 'foreseeable' that it will be bound." (ECF No. 31, Ford Resp. Mot. Dismiss at PageID.822, quoting *Baker v. LeBoeuf, Lamb, Leiby & Macrae*, 105 F.3d 1102, 1106 (6th Cir. 1997) (quoting *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993)) and *Bova Properties, L.L.C. v. Velocity Ventures, L.L.C.*, No. 14-14602, 2015 WL 2125359, at *2 (E.D. Mich. May 6, 2015) (Edmunds, J.) ("[A] non-signatory to a forum selection clause may be bound if the non-signatory is closely related to the contracting parties or dispute, such that it was foreseeable that it will be bound." (quotations omitted)) (See also ECF No. 58, Ford Supp. Resp. at PageID.1610.)

KRBS asserts in response that the Sixth Circuit Court of Appeals has mentioned the closely-related doctrine in only three cases – *Ingram Barge Co. v. Zen-Noh Grain Corp.*, 3 F.4th 275 (6th Cir. 2021); *Wilson v. 5 Choices, LLC*, 776 F. App'x 320 (6th Cir. 2019); and *Baker v. LeBoeuf, Lamb, Leiby & Macrae*, 105

20

F.3d 1102 (6th Cir. 1997) – and that none of those cases require the application of the closely-related doctrine in this case.

## 1. Sixth Circuit Court of Appeals Cases

There does not appear to be a definitive ruling in the Sixth Circuit as to when a party to a contract can seek to bind a non-party to a forum selection clause's jurisdictional mandate. *Baker v. LeBoeuf, Lamb, Leiby & Macrae*, 105 F.3d 1102 (6th Cir. 1997), involved a non-signatory defendant seeking to invoke a forum selection clause against signatory plaintiffs. In *Baker*, the plaintiffs filed suit in the Southern District of Ohio and the defendant/non-signatories moved to dismiss on grounds of improper venue (not personal jurisdiction), arguing that venue was proper in England, pursuant to a forum selection clause in a contract between the plaintiffs and a third-party, Lloyds of London. *Id.* at 1104.[4] The district court denied the

---

[4] This distinction between venue and jurisdiction is notable. Motions to dismiss based on grounds of improper venue are driven primarily by concerns for the "convenience of litigants and witnesses," *Denver & R. G. W. R. Co. v. Bhd. of R. R. Trainmen*, 387 U.S. 556, 560 (1967), as well as by a range of "private and public interests," *Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384, 389 (2d Cir. 2011), while "personal jurisdiction involves due process limitations on a court's power to subject a defendant to its jurisdiction." *Johnson v. UMG Recordings, Inc. by MCA Records, Inc.*, No. 3:17-cv-01548, 2018 WL 4111912, at *4 (M.D. Tenn. Aug. 29, 2018) (noting that "venue raises important, but less fundamental, questions of convenience and efficiency"). "These constitutional requirements caution against a liberal application of forum selection clauses to non-signatory defendants." *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d

defendants' motion to dismiss for improper venue, which the Sixth Circuit affirmed. The Sixth Circuit relied in part on *Hugel v. Corporation of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993), which held that "to bind a non-party to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound." The Sixth Circuit held that because the defendants were not parties to the contract containing the forum selection clause, and the defendants were not closely related to a dispute over that contract or to the contracting parties, they

---

379, 395 (S.D.N.Y. 2019) (discussing different considerations between venue and personal jurisdiction); *see also Davis ex rel. Donohue v. Martin*, No. 1:15-CV-0508, 2015 WL 3697505, at *2 (M.D. Pa. June 12, 2015) ("The concepts of personal jurisdiction and venue both concern the territorial reach of the tribunal and not its basic adjudicative power. Personal jurisdiction focuses on the defendant's activities availing him of the forum and involves both statutory and constitutional dimensions. Considerations relevant to venue are solely statutory, and the inquiry is broader, looking into the location of other parties and their activities.").

As discussed *supra*, to assert personal jurisdiction over a defendant, a plaintiff must make a baseline showing that the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co.*, 326 U.S. at 316. Regardless of the convenience to the parties or the private and public interests at stake, a court cannot exercise personal jurisdiction unless "the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). "[T]he relationship must arise out of contacts that the defendant himself creates with the forum State," not "contacts between the plaintiff (or third parties) and the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014).

could not invoke the forum selection clause in the contracts between the plaintiffs and Lloyd's and thus venue was proper in the court below. *Baker*, 105 F.3d at 1106.

The second case, *Wilson v. 5 Choices, LLC*, 776 F. App'x 320 (6th Cir. 2019), is unpublished and non-binding, and also involves a challenge to venue, not personal jurisdiction. In *Wilson,* the 21 plaintiffs brought a RICO action against a group of 26 corporate defendants in Michigan for fraud and conspiracy in connection with a real estate investment scheme. The plaintiffs had a contractual relationship with some of the defendants (the "privity defendants"), and those contracts contained a Utah forum selection clause, but the plaintiffs did not have a contract with the remaining defendants (the "non-privity defendants"). The district court dismissed all the claims, determining that the forum selection clauses were enforceable against all defendants.

The plaintiffs appealed, arguing in part that the court should not have dismissed plaintiffs' claims against the non-privity defendants because those claims had no directly applicable forum selection clause. The Sixth Circuit affirmed dismissal of the plaintiffs' claims against the defendants with whom the plaintiffs did not have a contract (the "non-privity defendants"), finding that all of the defendants were affiliated in one conspiracy and that the alleged conduct of the non-privity defendants is so closely related to the contractual relationship that the forum

selection clauses apply to all defendants. *Id.* at 329. The Sixth Circuit stated that "Plaintiffs should not be allowed to escape the enforceable forum-selection clauses they had with the privity Defendants merely by instead suing those Defendants' non-privity affiliates to recover on the very contracts containing the forum selection clauses." *Id.* In reaching its decision, the Sixth Circuit stated that "other courts have noted that 'a range of transaction participants, parties and non-parties should benefit from and be subject to forum selection clauses' where 'the alleged conduct of the non-parties is so closely related to the contractual relationship that the forum selection clause applies to all defendants.'" *Id.* (quoting *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988) (citation omitted)).

Finally, in *Ingram Barge Co. v. Zen-Noh Grain Corp.*, 3 F.4th 275 (6th Cir. 2021), a maritime case, defendant Zen-Noh purchased shipments of grains from several companies (the sellers), and the sellers were required to prepay the barge freight and deliver the product to Zen-Noh's grain trading terminal in Louisiana. Plaintiff Ingram Barge issued a contract to the sellers (not Zen-Noh) for the transportation of the goods – a bill of lading which generally identified Zen-Noh as a "'notify' party 'A/C' the consignor/consignee." Each bill of lading contained a forum selection clause selecting the U.S. District Court for the Middle District of Tennessee. Ingram alleges that it notified Zen-Noh of the terms of the bill of lading

24

through an email to CGB Enterprises, Inc., which Ingram believed to be "closely connected with Zen-Noh and Zen-Noh is a part-owner of CGB." *Id.* at 278. Ingram sent Zen-Noh invoices for costs related to shipment and delivery, which Zen-Noh rejected because it was not a party to the contract. Ingram then sued Zen-Noh in Tennessee, but the district court dismissed the case for lack of jurisdiction.

On appeal, the Sixth Circuit Court of Appeals opened by stating "[t]ypically, only parties to a contract are bound to its terms," and that "[t]his case is no exception." *Id.* at 277. The court found that "these contracts bind the parties that negotiated them," Ingram and the sellers, not Zen-Noh. The Sixth Circuit explained that, even considering Zen-Noh a consignee of the bills of lading, it is considered a third-party beneficiary to the bills of lading and can only be bound by them with its consent, shown by: (1) filing suit; (2) course of conduct; or (3) accepting through an agent. *Id.* at 279; *see also id.* at 280 ("While Zen-Noh is a beneficiary of these bills of lading, that 'mere fact … does not create contractual obligations for that beneficiary.'") (quoting *Dynamic Worldwide Logistics, Inc. v. Exclusive Expressions, LLC*, 77 F. Supp. 3d 364, 374 (S.D.N.Y. 2015)). The Court of Appeals found that "Ingram presents no evidence that the grain sellers were 'acting on behalf' of Zen-Noh or under Zen Noh's control when the sellers entered the bills of lading," and that Ingram has not shown that Zen-Noh consented to the bills of lading even

25

though Zen-Noh was part of the overall deal, was mentioned in the bills of lading, and might have been a third-party beneficiary. The Sixth Circuit held that "Ingram must show Zen-Noh consented to its bills. It has not. Accordingly, we AFFIRM the district court's dismissal." *Id.* at 280.

### 2. District courts within the Sixth Circuit

Lower courts in the Sixth Circuit have expanded on these principles, finding, based on the facts in the individual cases, that a non-signatory to a forum selection clause may be bound to that clause, and thus subject to personal jurisdiction, if the non-signatory is closely related to the contracting parties or the dispute, such that it was foreseeable to the non-signatory that it will be bound. *Compare, e.g., Troll Smokehouse v. Reich*, No. 21-12332, 2022 WL 9459013 (E.D. Mich. Oct. 14, 2022) (Cox, J.) (refusing to bind plaintiff/non-signatory to contract with forum selection clause, even though plaintiff "was certainly the impetus for the sale" and a third-party beneficiary of the contract, because plaintiff did not sign the contract and did not receive the order confirmation or the forum selection clause, and thus did not consent to the forum selection clause); *MCM Mgmt. Corp. v. Jenkins Env't, Inc.*, No. 21-cv-10970, 2022 WL 447056, at *2 (E.D. Mich. Feb. 14, 2022) (Steeh, J.) (declining to exercise jurisdiction over non-signatories who did not have a contractual relationship with the signatory, were not subsidiaries of the signatory,

and who did not assume, adopt, or incorporate by reference the underlying contract, and thus "would have no reason to suspect that they might be haled into court in Michigan, a state that has no connection with the project or work they were hired to perform"); *with Pensmore Reinforcement Technologies, LLC v. McClay Indus. Pty, Ltd.*, No. 2:20-cv-13073, 2022 WL 92331, at *2 (E.D. Mich. Jan. 7, 2022) (finding forum selection clause applied to nonparty to the contract – the defendant company's director, an Australian resident – because he is closely related to the contractual relationship, he signed the agreement on behalf of the company, and the agreement provided that it is "binding upon the Parties, their officers, employees and agents"); *Red Mortg. Cap., LLC v. Shores, LLC*, No. 2:16-cv-678, 2017 WL 1196170 (S.D. Ohio Mar. 31, 2017) (exercising personal jurisdiction over non-signatory to contract with forum selection clause because that individual is the owner of the signatory defendant and guarantor of the loan, and thus "is intimately associated with Shores, the Project, and the Loan" and "easily satisfies the foreseeability test"); *Bova Properties, LLC*, 2015 WL 2125359 at *2-3 (finding that a non-signatory, the sole owner of the defendant company, is bound by the forum selection clause because he negotiated and executed the agreement on behalf of the defendant company and is named in the agreement, and thus is "so closely related to both Defendant Velocity

and this dispute that it was foreseeable" that he would be "hailed into the selected forum").

### 3.  Other jurisdictions

Other jurisdictions have adopted a similar rule. *See, e.g., Franlink, Inc. v. BACE Servs., Inc.*, 50 F.4th 432, 441-42 (5th Cir. 2022) (expressly adopting the closely-related doctrine and considering the following factors: (1) common ownership between the signatory and the non-signatory; (2) direct benefits obtained from the contract at issue; (3) knowledge of the agreement generally; and (4) awareness of the forum selection clause particularly); *Stifel, Nicolaus & Co. v. Lac du Flambeau Band of Lake Superior Chippewa Indians*, 807 F.3d 184, 212 (7th Cir. 2015), *as amended* (Dec. 14, 2015) ("[W]e reiterated that the test for whether a nonparty to a contract can enforce—and be bound by—a forum selection clause 'is whether the nonparty is "closely related" to the suit.' Acknowledging that this is a 'vague standard,' we noted that 'it can be decomposed into two reasonably precise principles': '"affiliation" and "mutuality,"' either of which is sufficient to allow a nonparty to invoke a forum selection clause." (citations omitted)); *Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 701 (2d Cir. 2009) (holding that a non-signatory successor in interest to a signatory of a contract was subject to the mandatory forum selection clause in the contract); *Marano Enters. of Kansas v. Z-*

28

*Teca Rests., L.P.*, 254 F.3d 753, 757-58 (8th Cir. 2001) (holding that plaintiff "shareholder, officer and director" of signatory "is, without question, 'closely related' to the disputes arising out of the agreements and properly bound by the forum-selection clause"); *Prospect Funding Holdings, LLC v. Vinson*, 256 F. Supp. 3d 318, 324 (S.D.N.Y. 2017) (collecting cases allowing a signatory to a contract to invoke the forum selection clause against a non-signatory if the non-signatory is closely related to one of the signatories or to the dispute such that it is foreseeable that it will be bound); *Synthes, Inc. v. Emerge Med., Inc.,* 887 F. Supp. 2d 598, 607 (E.D. Pa. 2012) (recognizing that a forum selection clause also applies to a non-signatory third party where the third party's conduct is closely related to the contractual relationship or the contractual dispute and where the third party enjoys financial benefit from the contract); *but see Franlink, Inc.*, 50 F.4th at 440 (stating that common ownership alone is insufficient for 'a nonparty to a contract to be able to invoke, or be bound by, a clause in [the contract].'") (citing *Adams v. Raintree Vacation Exch.*, 702 F.3d 436, 440 (7th Cir. 2012)).

However, other courts have questioned the constitutionality of using the "closely related" test to exercise personal jurisdiction over a non-signatory to a contract with a forum selection clause. Those courts reason that the exercise of jurisdiction over a party bound by a forum selection clause is based on consent. If

the party has consented to a particular forum in a "freely negotiated" agreement, the party is deemed to have waived their right to challenge personal jurisdiction and no further due process "minimum contacts" analysis is required. *Burger King*, 471 U.S. at 472 n.14. But the rationale underlying that rule is absent in cases in which the defendant is not even a party to the agreement. Some courts have found that, under those circumstances, a court should not exercise jurisdiction unless the record otherwise demonstrates "minimum contacts" between the defendant and the forum. *See, e.g., Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 394-95 (S.D.N.Y. 2019) (conducting a minimum contacts analysis because "constitutional requirements caution against a liberal application of forum selection clauses to non-signatory defendants"); *Guaranteed Rate, Inc. v. Conn*, 264 F. Supp. 3d 909, 926 (N.D. Ill. 2017) (dismissing defendant for lack of personal jurisdiction where defendant lacked minimum contacts with the forum, notwithstanding plaintiff's argument that the defendant was closely related to a contract containing a forum selection clause); *Central Transp. Servs., Inc. v. Cole*, No. 13-1295, 2013 WL 6008303, at *5 (D. Kan. Nov. 13, 2013) (concluding that even if a "non-signatory can sometimes be bound by a forum selection clause that it did not agree to," in the present case, it would nevertheless "violate due process to exercise personal jurisdiction" over the non-signatory based solely upon the forum selection clause);

*Cf Slaihem v. Sea Tow Bahamas Ltd.*, 148 F. Supp. 2d 1343, 1348 (S.D. Fla. 2001) (holding that a court must consider whether binding a non-signatory to a forum selection clause "offends due process").

To sum, "[w]hen a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation." *Ingram*, 3 F.4th at 279 (citation omitted). Courts take a commonsense approach when determining whether it was foreseeable to a non-signatory that it may be bound by a forum selection clause. Specifically, "[t]his inquiry demands the Court assess the totality of the circumstances to determine whether, 'in light of [the] circumstances, it is fair and reasonable to bind a non-party *to the forum selection clause*.'" *MCM Mgmt. Corp.*, 2022 WL 447056, at *2 (emphasis added) (citing *Holtzman v. Village Green Mgmt. Co.*, No. 2:19-CV-11150, 2020 WL 264331, at *7 (E.D. Mich. Jan. 17, 2020) (Berg, J.) (citations omitted)). "[T]he closely-related doctrine is context specific and is determined only after weighing the significance of the facts relevant to the particular case at hand." *Franlink, Inc.*, 50 F.4th at 442 & n.8 (noting that "non-signatories should only have contractual provisions enforced against them in 'rare circumstances'" and that "a narrow application of the [closely-related] doctrine is both appropriate and necessary."). The principal consideration, however, is whether

the non-signatory should have reasonably foreseen that he might be required to appear *in another jurisdiction*:

> The relevant question in deciding whether a non-signatory is "closely related" is whether it was reasonably foreseeable that the non-signatory would be bound by the forum selection clause, *not* whether a contractual dispute with a signatory was reasonably foreseeable, as [Plaintiff] suggests.

*Prospect Funding Holdings*, 256 F. Supp. 3d at 325; *see also MCM Mgmt. Corp.*, 2022 WL 447056, at *3 (declining to exercise jurisdiction over non-signatory who "would  have no reason to suspect that they might be haled into court in Michigan, a state that has no connection with the project or work they were hired to perform"); *In re McGraw-Hill Global Educ. Holdings LLC*, 909 F.3d 48, 65 (3d Cir. 2018) ("A foreseeability finding in the context of forum selection clauses must have some evidentiary basis, other than pure speculation, that the party sought to be bound had an awareness of *the clause, its contents, and that it might be defensively invoked*…. [T]he *actual forum* [must] be foreseeable, and … there must be some evidentiary basis for such a finding.") (first emphasis added, second emphasis in original); *Zim Integrated Shipping Servs. Ltd. v. Bellweather Design Technologies LLC*, No. 19-cv-3444, 2020 WL 5503557, at *6 (S.D.N.Y. Sept. 10, 2020) ("'[T]he foreseeability that is critical to due process analysis … is that the defendant's conduct … [is] such

that he should reasonably anticipate being haled into court' in the relevant forum.")

(quoting *Burger King Corp.*, 471 U.S. at 474).

### C.   Whether Non-Signatory KRBS is Bound By the TSA's Forum Selection Clause

#### 1.   Whether non-signatory KRBS is sufficiently "closely related" to the contractual dispute under the TSA to be bound by the TSA's forum selection clause

Plaintiff Ford argues that KRBS is bound to the TSA's forum selection clause because it fulfilled K-Line's obligations under the TSA, and thus it is "closely related" to the contractual dispute. (ECF No. 31, Ford Resp. Mot. Dismiss at PageID.825-29.) Ford contends that KRBS managed the Ship carrying Ford's cargo, fulfilling obligations essential to the performance of the TSA, and that the 2013 SMA made KRBS responsible for ensuring compliance with safety requirements. (*Id.* citing ECF No. 29-3, SMA at ¶¶ 4, 5, 17, PageID.484-85, 492-93.) Ford further contends that Defendant K-Line actively arranged with the Ship Owner, Diamond, through the Time Charter Agreement in 2013, for KRBS to manage and operate the Ship, and thus KRBS's "role in the performance of the TSA was no mere happenstance." (*Id.* at PageID.827.) Ford continues that KRBS's failure to properly perform its duties "directly led to the loss of the Rangers and accordingly this

lawsuit," and that it was "unquestionably foreseeable that [KRBS] would be involved in a contract dispute in this forum." (*Id.* at PageID.828.)

Defendant KRBS argues that the three contracts at issue in this matter – (1) the 2013 SMA between Diamond and KRBS; (2) the 2013 Time Charter Agreement between K-Line and Diamond; and (3) the 2019 TSA between K-Line and Ford – are each stand-alone, arms-length contracts that preclude the application of the "closely related" doctrine relied upon by Ford. (ECF No. 35, KRBS Reply Mot. Dismiss at PageID.865-66.) KRBS contends that it is not a subcontractor of K-Line and is only a party to the SMA, with Diamond. The TSA, between Ford and K-Line, contains a broad integration clause that provides that only the express terms of the TSA apply to shipments under it, and the TSA expressly creates no third-party beneficiary rights. (*Id.* at PageID.866, citing ECF No. 19-2, TSA ¶¶ 13, 28, PageID.282-83, 297.) KRBS argues that courts caution against the liberal application of forum selection clauses to non-signatory defendants, and then only when it is foreseeable to the non-signatory that it could anticipate being haled into the actual relevant forum for the dispute at issue. KRBS asserts that the only possible connection between Michigan and KRBS is this lawsuit. KRBS is not a party to the TSA and its sole contractual relationship relevant to this dispute is the 2013 contract with non-party Ship Owner Diamond. KRBS had no knowledge of the 2019 TSA

between Ford and K-Line. (ECF No. 35, KRBS Reply Mot. Dismiss at PageID.870.) (ECF No. 54, KRBS Supp. Brief at PageID.1398-99.)

Ford does not argue that KRBS has constitutionally sufficient minimum contacts with Michigan sufficient to subject it to personal jurisdiction here, and instead relies solely on the forum selection clause in the TSA as a basis for personal jurisdiction. The Court finds that Ford fails to allege facts or evidence supporting its contention that it would be reasonably foreseeable to KRBS that it would be subject to the TSA's forum selection clause and haled into court in Michigan. "[W]hat is relevant for constitutional purposes is not whether the parties to an agreement find it foreseeable that a third party could be bound by the agreement's forum selection clause; rather, 'the foreseeability that is critical to due process analysis … is that the defendant's conduct … [is] such that *he* should reasonably anticipate being haled into court' *in the relevant forum*." *Spectrum Dynamics Med. Ltd. v. General Elec. Co.*, No. 18-cv-11386, 2023 WL 4159358, at *8 (S.D.N.Y. June 2, 2023) (emphases added) (quoting *Burger King*, 471 U.S. at 474).

KRBS's arguments are persuasive. KRBS's involvement in this matter arises solely out of its management of the *Diamond Highway*, pursuant to its 2013 contract with the Ship owner, Diamond, which is not a party in this action. The TSA between Ford and K-Line, with the forum selection clause, was entered into six years *after*

35

the SMA between Diamond and KRBS. KRBS did not negotiate or sign the TSA, it is not mentioned in the TSA, it is not even a third-party beneficiary of that contract, and it cannot enforce that contract. KRBS has presented undisputed evidence that it "had no knowledge of the TSA's contents before the fire aboard the vessel, and was not aware until this lawsuit that the TSA included a Michigan forum selection provision," that "KRBS never consented to the TSA's forum selection provision," and that it "did not receive or see a copy of the TSA, or have any contact with Ford, before this lawsuit." (ECF No. 54-2, Takimoto Decl. ¶ 8, PageID.1430-31.) Even if KRBS was generally aware of the existence of the TSA, mere knowledge of the agreement and the possibility of litigation alone is insufficient to show foreseeability under the closely-related doctrine. *See Logicalis, Inc. v. Graves*, No. 20-cv-11724, 2020 WL 12689956, at *2 (E.D. Mich. Nov. 23, 2020) (Friedman, J.).

It cannot be simply that KRBS's involvement as the technical manager of the *Diamond Highway* at the time of the Ship's fire near Taiwan alone is sufficient to subject KRBS, a Japanese corporation, to jurisdiction in Michigan, pursuant to a contract between Ford and K-Line. As KRBS argues, "[i]f simply managing the ship for a third-party owner were sufficient to expose KRBS to forum selection clauses in K-Line's subsequent commercial contracts [with third parties], then KRBS could be haled into courts and venues around the world based on the hundreds of shipping

36

contracts that K-Line negotiates [with other parties], none of which KRBS negotiated, signed, benefited from, or imposed any duties on KRBS." (ECF No. 35, KRBS Reply Mot. Dismiss at PageID.870.)

While Ford cites to several unpublished cases from other courts in this Circuit and elsewhere, binding non-signatories to forum selection clauses, as KRBS points out in its briefing, none of those cases are at all factually similar to this admiralty case. (ECF No. 35, KRBS Reply Mot. Dismiss at PageID.868-69 (summarizing cases)) (ECF No. 59, KRBS Supp. Reply, PageID.1821-22 (summarizing cases).) The cases Ford relies on do not involve a foreign defendant or a maritime claim, multiple arms-length contracts and parties, or otherwise bear a factual resemblance to this case. Ford does not meaningfully address the Sixth Circuit Court of Appeals decisions discussed *supra*, especially the *Ingram Barge* decision, which discusses application of the closely related doctrine in the context of an admiralty case and observes that maritime contracts "should be construed 'by their terms and consistent with the intent of the parties'" and that courts are particularly hesitant to apply the closely related doctrine to bind a non-signatory defendant to a forum selection clause as a means of obtaining jurisdiction over the non-signing party. *Ingram*, 3 F.4th at 279 (stating that maritime contracts "bind the parties that negotiated them … only with their consent").

The New York District Court's opinion in *Zim Integrated Shipping Services Ltd. v. Bellweather Design Technologies LLC*, No. 19-cv-3444, 2020 WL 5503557 (S.D.N.Y. Sept. 10, 2020), an admiralty case, though unpublished, is instructive. In that case, party A entered into a Bill of Lading with party B, and party B subsequently entered into a transportation contract with party C. Party C then entered into a separate transportation contract with party D. The Bill of Lading (between parties A and B) contained a forum selection clause setting the United States District Court for the Southern District of New York as the appropriate forum for any claims and/or disputes arising under the Bill of Lading. *Id.* at *1-2. The New York District Court declined to exercise personal jurisdiction over party D, a non-signatory to the Bill of Lading, because no facts were alleged suggesting that party D was aware of the Bill of Lading's forum selection clause. *Id.* at *6. The court noted that "the 'constitutional requirements [of personal jurisdiction] caution against a liberal application of forum selection clauses to non-signatory defendants.'" *Id.* at *5 (quoting *Arcadia Biosciences*, 356 F. Supp. 3d at 395).

The *Zim* court further noted that "in an admiralty case, such as this one, 'it is well established that a forum selection clause in a contract between a shipper and a carrier pursuant to [the Carriage of Goods by Sea Act] does not operate as a consent to personal jurisdiction for subcontractors….'" *Id.* at *6 (collecting cases); *see also*

*Herod's Stone Design v. Mediterranean Shipping Co.*, 434 F. Supp. 3d 142, 153 n.7

(S.D.N.Y. 2020) (refusing to enforce forum selection clause in an admiralty case in

a contract between a shipper and a carrier to a subcontractor of the carrier because

"it is well established that a forum selection clause in a contract between a shipper

and a carrier … does not operate as consent to personal jurisdiction for

subcontractors"). The *Zim* court noted that "it is undisputed that neither [Party C nor

Party D] is a party to the Bill of Lading, and [Party D] contracted with [Party C], not

[Parties A or B] – the actual parties to the Bill of Lading." *Zim Integrated Shipping

Servs.*, 2020 WL 5503557, at *6.

Similarly, here neither KRBS nor Diamond are a party to the TSA, and KRBS

contracted only with Diamond in 2013, not with Ford or K-Line – the parties to the

June 2019 TSA – and thus KRBS owed contractual duties only to Diamond. KRBS

was paid under the SMA without regard to which vehicles or other items the vessel

carried pursuant to the TSA and it received no direct benefit from the TSA. KRBS

had no contractual or business relationship with K-Line as to the vessel management

services for the *Diamond Highway*. Under Ford's theory of jurisdiction, KRBS could

be bound to forum selection clauses in all of K-Line's transportation contracts with

various entities around the world simply by virtue of entering into the 2013 SMA

with Diamond. There is no evidence KRBS ever contracted or agreed to that. "[T]he

'constitutional requirements [of personal jurisdiction] caution against [such] a liberal application of forum selection clauses to non-signatory defendants'" like KRBS. *Zim Integrated Shipping Servs.*, 2020 WL 5503557, at *5 (citation omitted); *see also Prospect Funding Holdings*, 256 F. Supp. 3d at 325-26 ("The vast majority of cases that have found a non-signatory bound by a forum selection clause under the theory that they are 'closely related' to the signatory or the dispute have done so where the non-signatory had an active role in the transaction between the signatories or where the non-signatory had an active role in the company that was the signatory.") (collecting cases).

The Court finds, viewing the facts in the light most favorable to Ford, that Ford fails to show that KRBS is sufficiently "closely related" to the dispute between Ford and K-Line to be subject to the TSA's forum selection clause. *See MCM Mgmt. Corp.*, 2022 WL 447056, at *2 (declining to exercise jurisdiction over non-signatories (downstream subcontractors who promised to properly perform some of the work that is the subject of the principal dispute) who did not have a contractual relationship with the signatory, were not subsidiaries of the signatory, and who did not assume, adopt, or incorporate by reference the underlying contract, and thus "would have no reason to suspect that they might be haled into court in Michigan, a state that has no connection with the project or work they were hired to perform").

40

### 2. Whether KRBS is sufficiently "closely related" to K-Line to be bound by the TSA's forum selection clause

Plaintiff Ford also argues that KRBS is bound to the TSA's forum selection clause because it is closely related to K-Line "because of the statutorily mandated vertical integration of the two entities." (ECF No. 31, Ford Resp. Mot. Dismiss at PageID.829-30.) Ford alleges that KRBS "acts as a subservient entity to K-Line," and analogizes the parties' relationship to that of the parties in *Wiedo v. Securian Life Insurance Co.*, No. 3:19-cv-00097-GFVT, 2020 WL 5219536 (E.D. Ky. Sept. 1, 2020). (*Id.*) Ford argues that, in this case, "K-Line and [KRBS] work in tandem to carry out the shipping contracts entered by the parent company," and thus "'it is highly foreseeable that disputes may arise in which both are involved.'" (ECF No. 31, Ford Resp. Mot. Dismiss at PageID.830 (quoting *Wiedo*). However, the *Wiedo* case is distinguishable.

*Wiedo v. Securian Life Insurance Co.* involved a suit against an employer and the insurer of the employer's benefit plan, and a decision on a motion to transfer venue, not a motion to dismiss for lack of personal jurisdiction. The Kentucky District Court found, considering the 28 U.S.C. § 1404 factors, that the non-signatory defendant insurance company was bound by the forum selection clause contained in the co-defendant employer's employee welfare benefit plan because of

41

the two defendants' "business relationship" and their "integrated approach" in which "[defendant employer] provides its employees insurance and [defendant insurance company], as the insurance provider, is the entity that pays the benefits when proper." 2020 WL 5219536, at *6-7. The court found that it was "highly foreseeable" that disputes may arise in which both agreements are involved and that the defendant insurance company "is closely related to both Mr. Wiedo and [the employer] as it relates to this dispute." *Id.* (noting that "the Wrap Plan, insurance contracts, and other relevant documents all operate together"). Here, it is undisputed that KRBS played no role in executing or negotiating the TSA and did not interfere with it or owe Ford any obligations under it.

Defendant KRBS argues in its Reply brief that it is not so closely related to K-Line that it should be bound by all contracts that K-Line enters into for cargo carriage on vessels that KRBS manages. (ECF No. 35, KRBS Reply Mot. Dismiss at PageID.870.) KRBS states that, contrary to Ford's allegations regarding the Japanese government-led shipping industry consolidation laws of the 1960s, those laws were voluntary, not compulsory, effectively abandoned in 1985, formally repealed in 1999, and KRBS did not merge with Nippon Kisen Kaisha Ltd. until 2000 and become a wholly-owned subsidiary of K-Line. Those laws thus were repealed before KRBS became a subsidiary of K-Line and did not compel K-Line to

42

delegate any duties to KRBS under the 2019 TSA. (*Id*.) KRBS contends that while courts have found that "'non-signatory alter-egos, corporate executive officers, and successors-in-interest have all, at least in some instances, satisfied the "closely related" test,'" KRBS is not K-Line's alter ego, and the two entities are completely separate companies with different lines of business. (*Id*. quoting *Affiliated FM Ins. Co. v. Kuehne + Nagel, Inc.*, 328 F. Supp. 3d 329, 336 (S.D.N.Y. 2018).)

The Court finds, construing the facts in the light most favorable to Ford, that Ford fails to establish that KRBS and K-Line are so closely related that KRBS should be bound to the TSA's forum selection clause based on that corporate relationship alone. Ford focuses on K-Line's and KRBS's relationship in a "vertical integration." (ECF No. 31, Ford Resp. Mot. Dismiss at PageID.830.) However, KRBS stated in its opening brief that it is not K-Line's alter ego and provided extensive argument in support regarding the corporate separateness of the two entities, including providing affidavits attesting to the facts stated in the motion. Ford does not address or dispute KRBS's alter ego argument in its motion. (*Id*. at p. 3, PageID.815 ("Ford's Complaint does not make an alter-ego claim.").) "Michigan law presumes that, absent some abuse of corporate form, parent and subsidiary corporations are separate and distinct entities" for purposes of personal jurisdiction. *See Anwar v. Dow Chem. Co.*, 876 F.3d 841, 850 (6th Cir. 2018) (quoting *Seasword v. Hilti, Inc.*, 449 Mich.

542, 547-48 (1995)). Moreover, courts have held that even one-hundred percent ownership and common directors and officers are insufficient to establish an alter ego relationship and thus expose to one corporation liability for the other's acts. *Cf. United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (stating "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts."); *see also Adams*, 702 F.3d at, 440 (stating that "there has to be a reason, rather than the mere fact of affiliation, for a nonparty to a contract to be able to invoke, or be bound by, a clause in it").

Ford has failed to present any evidence showing that KRBS is K-Line's alter ego or otherwise "intimately involved" in K-Line's business or relationship with Ford through the TSA. Ford points to Shareholder Meeting Minutes in which KRBS is sometime described as the "in-house ship management company for Kawasaki Kisen." (ECF No. 58, Ford Supp. Resp. at PageID.1605.) However, as KRBS argues, that is immaterial to this case because KRBS did not do so in connection with the *Diamond Highway*. Rather, KRBS entered into a contractual relationship with Diamond in this matter to manage the *Diamond Highway* in the 2013 SMA, which those parties entered six years *before* the 2019 TSA between K-Line and Ford. K-Line is not a party to the SMA. Ford has failed to satisfy the foreseeability test based

on KRBS's relationship as a subsidiary of K-Line. Thus, the Court finds that KRBS cannot be bound by the forum selection clause in the TSA merely by virtue of KRBS's role as a subsidiary of K-Line.

Moreover, as discussed above, Ford's theory would make KRBS subject to a forum selection clause in every contract K-Line enters with another company for the transport of cargo on a ship KRBS manages, without KRBS ever seeing those contracts, negotiating those contracts, or receiving a benefit from those contracts. And even if the K-Line's and KRBS's involvement in the shipping contracts was something that should cause KRBS to be aware that disputes could arise as a result of those contracts, this is a far cry from it being foreseeable to KRBS that it could be haled into court in Michigan, a state with no ready connection to KRBS's activities.

Accordingly, the Court finds that it does not have personal jurisdiction over KRBS pursuant to the forum selection clause in the 2019 TSA between Ford and K-Line. Ford does not argue that KRBS is otherwise subject to this Court's personal jurisdiction.

## IV.  CONCLUSION

For all the reasons set forth above, the Court finds that it does not have personal jurisdiction over Defendant KRBS in this case and therefore GRANTS Defendant KRBS's Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. P. 12(b)(2).

This case will proceed with Ford's claims against K-Line and KAM.

IT IS SO ORDERED.

s/Paul D. Borman<br>
Paul D. Borman<br>
United States District Judge

Dated: August 8, 2023